[Cite as *State v. Cunningham*, 2012-Ohio-2794.]

IN THE COURT OF APPEALS OF CLARK COUNTY, OHIO

STATE OF OHIO                          :

     Plaintiff-Appellee              :        C.A. CASE NO. 10-CA-57

vs.                                    :        T.C. CASE NO. 08-CR-879

                                       :        (Criminal Appeal From
CHARLES CUNNINGHAM                              Common Pleas Court)
     Defendant-Appellant             :

. . . . . . . . .

## O P I N I O N

Rendered on the 22nd day of June, 2012.

. . . . . . . . .

Lisa M. Fannin, Atty. Reg. No. 0082337, Assistant Prosecuting Attorney, 50 E. Columbia Street, 4th Floor, P.O. Box 1608, Springfield, OH 45501
     Attorney for Plaintiff-Appellee

Brandin D. Marlow, Atty. Reg. No. 0076381, 150 N. Limestone Street, Suite 218, Springfield, OH 45501
     Attorney for Defendant-Appellant

. . . . . . . . .

**GRADY, P.J.:**

## I. Introduction

{¶ 1}   On October 4, 2008, Defendant Charles Cunningham was questioned by police and arrested for the murders earlier that morning of Jessica Serna, an ex-girlfriend and mother of two of his children, and Heidi Shook.  On October 15, 2008, the grand jury returned an 11-count indictment against Defendant relating to the murders of Serna and Shook. Following a jury trial, Defendant was convicted on ten of the eleven counts in the indictment. Ultimately, Defendant was sentenced to life in prison without possibility of parole.

{¶ 2}   On appeal, Cunningham raises six assignments of error concerning denial of his motion to suppress evidence obtained from his cellular phone, exclusion of an African-American from his jury, removal of a juror after jury deliberations had begun, the admission into evidence of voicemails Defendant had left for Serna, ineffective assistance of Defendant's trial counsel, the sufficiency and manifest weight of the evidence presented at trial, and whether cumulative errors violated Defendant's right to a fair trial.   For the reasons set forth below, we overrule the six assignments of error and we will affirm Defendant's conviction and sentence.

### A.  Statement of Facts

{¶ 3}   On the evening of October 3, 2008, Serna and Heidi Shook were in Springfield to celebrate Shook's birthday.  They began the evening at dinner with several friends, including Caitlin Smith and Serna's boyfriend, Marcus Douthy.  Most of the group then went to G.Z. Pete's, a bar, to continue celebrating.  Douthy, however, went home for the evening.

{¶ 4}   Serna and Shook later left G.Z. Pete's and went to the Night Gallery, another

bar in Springfield. Defendant appeared at the Night Gallery about ten to fifteen minutes after Shook and Serna had arrived there. While at the Night Gallery, Defendant approached Shook and Serna on the dance floor, but the two women avoided him and walked away.

{¶ 5} Serna and Shook then returned to G.Z. Pete's. Defendant appeared at G.Z. Pete's and bought drinks for Serna and Shook. Soon thereafter, Shook and Serna left G.Z. Pete's. When they left, Defendant left as well. Caitlin Smith witnessed an altercation between Defendant and Serna as they left G.Z. Pete's. Smith heard Defendant say to Serna, "Bitch, if I can't have my family, you can't have anything." (Trial Tr., p. 1724-1726.)

{¶ 6} Around 2:49 A.M., after leaving G.Z. Pete's, Serna, Shook, and J.R. Carson traveled in Shook's vehicle to the drive thru window at a Burger King restaurant on Main Street. While they were at the drive thru, Defendant drove his white SUV into the Burger King drive thru and partially blocked Shook's vehicle. At that time, Kenneth Robinson was a passenger in Defendant's vehicle. Defendant then exited his SUV and went to the passenger side of Shook's vehicle and asked Serna to roll down the window. Both Shook and Serna told Defendant to leave Serna alone. Defendant began arguing with Shook and Serna and hitting Shook's vehicle.

{¶ 7} The manager at Burger King heard the argument coming from the drive thru area and asked all several times to leave. Finally, the manager went outside with another employee to tell them to leave. While the manager was outside, she heard a man say he was going to "hurt 'em." The employee that accompanied the manager outside heard Defendant say, "I'll kill everybody in the truck."

{¶ 8} Serna, Shook, and Carson drove away from Burger King in Shook's vehicle.

Defendant Cunningham followed them, screeching his vehicle's tires as he pulled out in a westerly direction onto Main Street directly behind them. After following Serna, Shook, and Carson for a short time, Defendant pulled in front of them and blocked Shook's truck with his Chevy Suburban. The two vehicles were stopped near Bill Marine's Auto on North Street, west of its merger with Main Street. Once the vehicles were stopped, Defendant emerged from his SUV in a rage. Serna exited Shook's vehicle and began arguing with Defendant Cunningham outside the passenger side of Shook's vehicle. Carson exited Shook's vehicle and began walking away from the scene.

{¶ 9} During their argument, Serna pushed Defendant off of her. Defendant then punched Serna in the stomach causing her to fall to the ground. During the altercation between Serna and Defendant, Shook called 911. The dispatcher heard a girl screaming for help and saying, "Get off of her." Serna could be heard in the background screaming repeatedly for Defendant Cunningham to stop. Defendant could be heard in the 911 call saying, "I'm not playing man." The 911 dispatcher heard gunshots and dispatched police to the scene.

{¶ 10} Carson heard the gunshots and a scream as he walked away from the scene. He turned around and saw Shook coming through the two trucks towards her driver's side door. Carson heard more gunshots and saw Shook fall face first onto the pavement. He then saw Defendant walk between the trucks, and it appeared to Carson that Defendant was stuffing something into the back of his pants. Defendant walked up to Carson and told Carson to walk away with him.

{¶ 11} Kenneth Robinson, a passenger in Defendant's SUV, saw Defendant shoot

Serna and then shoot Shook. After shooting Serna and Shook, Defendant told Robinson to "get the hell out of here." As Robinson was driving Defendant's SUV away from the scene, he saw Defendant approach Carson on the sidewalk and walk away with him.

{¶ 12} Officers arrived at the scene of the gunshots at approximately 3:01 a.m. When Sergeant Harris arrived on the scene he saw Shook's vehicle sitting askew in the middle of the road in a traffic lane. When he exited his vehicle, Sergeant Harris saw Shook lying face down in a pool of blood on the road outside the driver's side door of her vehicle. Shook was dead. Sergeant Harris saw Serna lying on the ground when he stepped to the front of Shook's vehicle. She had been shot, but was still alive. He called for additional police units. An ambulance transported Serna to Miami Valley Hospital where she later died.

{¶ 13} Sergeant Meyer responded to the scene and reviewed a surveillance video from a nearby business. He told Detective Hicks that the surveillance video showed a white SUV as the other vehicle involved in the incident. Detective Hicks was familiar with Serna and Defendant's relationship and the fact that Defendant drove a white SUV. Detective Hicks began actively searching for Defendant, and received information that Defendant was at Miami Valley Hospital with Serna's family. A surveillance video also showed Carson and Defendant walking side by side away from the scene.

{¶ 14} After Detective Hicks identified Defendant as a suspect in the murders of Serna and Shook, he went with Detective Baader to Miami Valley Hospital to speak with Defendant. The detectives transported Defendant to the Springfield Police Department in order to interview him. The interview room at the police station was equipped with a closed circuit television that allowed Defendant's actions and words to be seen and heard by the

detectives. While in the interview room waiting to be questioned, Defendant was seen using a cellular phone. Detective Baader went into the interview room and seized the phone from Defendant to preserve all of the data on the phone until a search warrant could be obtained.

{¶ 15} After being interviewed by the police, Defendant was arrested for the murders of Serna and Shook. Defendant was transported to the Clark County Jail to be processed into the jail. While Defendant was being processed, the police discovered that Defendant had another cell phone on him. The police also seized that phone as evidence. Defendant's two cellular phones were not accessed for their contents by the police until search warrants were obtained.

B. Procedural History

{¶ 16} On October 15, 2008, the grand jury returned an eleven-count indictment against Defendant, which included two counts of aggravated murder in violation of R.C. 2903.01(A), two counts of felonious assault in violation of R.C. 2903.11(A)(2), two counts of murder in violation of R.C. 2903.02(A), two counts of felony murder in violation of R.C. 2903.02(B) and 2903.11(A)(2), two counts of having weapons while under disability in violation of R.C. 2923.13(A)(3), and one count of tampering with evidence in violation of R.C. 2921.12(A)(1). Counts I and V (aggravated murder) each included four specifications and the remaining counts each included one specification.

{¶ 17} On February 22, 2010, Cunningham filed a motion to suppress "all evidence resulting from the warrantless seizure and search of his cellular phones." (Dkt. 158.) A hearing on Defendant's motion was held on March 15 and 20, 2010. The trial court denied Defendant's motion on April 9, 2010. (Dkt. 162.)

{¶ 18} A jury trial began on April 12, 2010. After individual voir dire of the jury pool, testimony in the trial began on April 22, 2010. The jury found Defendant guilty on all counts and specifications except those in Count Five, the aggravated murder of Heidi Shook, and the specification in Count One that specified Jessica Serna was killed because she was a witness to an offense.

{¶ 19} After Defendant waived his right to have a psychological evaluation and/or presentence investigation prior to the commencement of the penalty phase, the trial court proceeded to the sentencing phase. On May 11, 2010, the jury found, by proof beyond a reasonable doubt, that the aggravating circumstance of which Defendant was found guilty outweighed any mitigating factors. The jury therefore recommended to the trial court that the sentence of death be imposed on Defendant. On May 26, 2010, the trial court found that the aggravating circumstance Defendant was found guilty of did not, by proof beyond a reasonable doubt, outweigh the mitigating factors presented. Consequently, the trial court sentenced Defendant to life in prison without the possibility of parole as to Count One. The trial court then sentenced Defendant on the remaining counts and ordered forfeiture of the motor vehicle specified in Count One of the indictment. (Dkt. 198.) Cunningham filed a timely notice of appeal.

## II. Legal Analysis

{¶ 20} First Assignment of Error:

{¶ 21} "THE TRIAL COURT ERRED IN OVERRULING DEFENDANT'S MOTION TO SUPPRESS."

{¶ 22} When ruling on a motion to suppress, "the trial court assumes the role of trier

of facts and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Hopfer*, 112 Ohio App.3d 521, 679 N.E.2d 321 (2d Dist.1996), quoting *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (4th Dist.1994). The court of appeals must accept the trial court's findings of fact if they are supported by competent, credible evidence in the record. *State v. Isaac,* 2d Dist. Montgomery No. 20662, 2005-Ohio-3733, ¶ 8, citing *State v. Retherford*, 93 Ohio App.3d 586, 639 N.E.2d 498 (2d Dist.1994). Accepting those facts as true, the appellate court must then determine, as a matter of law and without deference to the trial court's legal conclusion, whether the applicable legal standard is satisfied. *Id.*

{¶ 23} On February 22, 2010, Defendant filed a motion to suppress "all evidence resulting from the warrantless seizure and search of his cellular phones by Springfield police officers, in violation of the Fourth Amendment." (Dkt. 158.) Defendant cited *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, in support of his motion to suppress. The trial court denied Defendant's motion. (Dkt. 162.)

{¶ 24} On appeal, Defendant argues that the trial court erred in overruling his motion to suppress evidence obtained from the cell phone the police seized while Defendant waited in the police department's interview room. Defendant does not argue on appeal that the trial court erred in overruling his motion to suppress concerning the second cell phone that the police obtained from Defendant when he was being processed into jail. Also, Defendant does not argue the validity of the search warrants obtained to search the two phones. Consequently, we will limit our analysis to the propriety of the seizure of the first cell phone while Defendant waited in the police department's interview room.

{¶ 25} The Fourth Amendment to the United States Constitution and Article I, Section 14 of the Ohio Constitution guarantee the right of persons to be free from unreasonable searches and seizures. The constitutional protections, notably, prohibit unreasonable searches and seizures, not simply every search and seizure. "[A] search conducted without a warrant issued upon probable cause is 'per se unreasonable * * * subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), quoting *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). The Ohio Supreme Court has recognized six distinct exceptions to the warrant requirement, including a situation in which probable cause to search exists along with the presence of exigent circumstances. *State v. Akron Airport Post No. 8975, Veterans of Foreign Wars of U.S.*, 19 Ohio St.3d 49, 51, 482 N.E.2d 606 (1985).

{¶ 26} In *Segura v. United States*, 468 U.S. 796, 806-808, 104 S.Ct. 3380, 82 L.Ed.2d 599 (1984), the Supreme Court wrote:

> Different interests are implicated by a seizure than by a search. * * * A seizure affects only the person's possessory interests; a search affects a person's privacy interests. * * * Recognizing the generally less intrusive nature of a seizure, * * * the Court has frequently approved warrantless seizures of property, on the basis of probable cause, for the time necessary to secure a warrant, where a warrantless search was either held to be or likely would have been impermissible. * * *
>
> * * *
>
> Underlying these decisions is a belief that society's interest in the

discovery and protection of incriminating evidence from removal or destruction can supersede, at least for a limited period, a person's possessory interest in property, provided that there is probable cause to believe that that property is associated with criminal activity.

{¶ 27} In *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426, 920 N.E.2d 949, syllabus, the Court held: "The warrantless search of data within a cell phone seized incident to a lawful arrest is prohibited by the Fourth Amendment when the search is unnecessary for the safety of law-enforcement officers and there are no exigent circumstances." The Ohio Supreme Court in *Smith*, however, like the United States Supreme Court in *Segura*, stressed that the police have a legitimate interest in collecting and preserving evidence prior to the issuance of a search warrant. The Court wrote, at ¶ 23:

Once the cell phone is in police custody, the state has satisfied its immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost nor erased. But because a person has a high expectation of privacy in a cell phone's contents, police must then obtain a warrant before intruding into the phone's contents.

{¶ 28} The police did not search the contents of Defendant's cell phone at issue until after a search warrant was obtained to search those contents. Defendant does not challenge the validity of the search warrant but instead argues that the seizure of the cell phone itself without a warrant required the trial court to exclude all evidence derived from the cell phone after the search warrant was issued pursuant to the Supreme Court's decision in *Smith*. We

do not agree.

**{¶ 29}** The police had identified Defendant as a key suspect in a double homicide that occurred only hours before Defendant was sitting in the interview room. (Motion to Suppress Tr., p. 7-10.) Defendant was at police headquarters for purposes of an interview concerning those crimes and used the phone while waiting to be interviewed. Defendant's phone was confiscated by police out of a concern that relevant information memorialized on the phone would be deleted or lost. At no point between the time that Detective Baader seized Defendant's cellular phone and the time when the search warrant was issued did the police search the records stored inside Defendant's phone. (*Id.* at 15, 25, 39, 42, 46, 50.)

**{¶ 30}** The police had probable cause to seize Defendant's cellular phone until a search warrant could be obtained. As the Supreme Court recognized in *Smith*, the police had an "immediate interest in collecting and preserving evidence and can take preventive steps to ensure that the data found on the phone are neither lost nor erased." *Smith*, ¶ 23. The confiscation of Defendant's phone did just that.

**{¶ 31}** The first assignment of error is overruled.

**{¶ 32}** Second Assignment of Error:

**{¶ 33}** "MULTIPLE ERRORS WITH THE JURY DEPRIVED CUNNINGHAM A RIGHT TO A FAIR TRIAL."

**{¶ 34}** "A. BY EXCLUDING THE ONLY AFRICAN-AMERICAN JUROR ON THE PANEL, THE STATE DENIED DEFENDANT HIS EQUAL PROTECTION RIGHTS."

**{¶ 35}** Defendant argues that the trial court erred in allowing the State to use a peremptory challenge to remove the last African-American juror from the jury panel. In

*Batson v. Kentucky* (1986), 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69, the United States Supreme Court held that the Equal Protection Clause forbids the prosecution from exercising a peremptory challenge to excuse a juror solely because of that juror's race. "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race, or on the false assumption that members of his race as a group are not qualified to serve as jurors[.]" *Id.* at 86 (Citations omitted.)

{¶ 36} The court must undertake a three-step inquiry when a peremptory challenge is challenged under *Batson*. First, the defendant must set forth a prima facie case of discrimination. To establish a prima facie case of discrimination, "the defendant must point to facts and other relevant circumstances that are sufficient to raise an inference that the prosecutor used its peremptory challenge specifically to exclude the prospective juror on account of his race." *State v. Carver*, 2d Dist. Montgomery No. 21328, 2008-Ohio-4631, ¶ 48, citing *Batson*, 476 U.S. at 95.

{¶ 37} If the defendant establishes a prima facie case of discrimination, the prosecutor must state a race-neutral explanation for striking the juror in question. *State v. Lewis*, 2d Dist. Montgomery No. 23850, 2011-Ohio-1411, ¶ 76. A race-neutral explanation means one based on something other than the juror's race. *Hernandez v. New York*, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* "[T]he issue is the facial validity of the prosecutor's explanation." *Id.*

{¶ 38} If the prosecutor provides a race-neutral explanation, the trial court must determine whether the defendant met his burden of proving intentional discrimination or

whether the prosecutor's explanation was a pretext. *Lewis*, ¶ 76. "A trial court's finding of no discriminatory intent will not be reversed on appeal unless clearly erroneous." *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 61 (Citations omitted.)

**{¶ 39}** The trial court found that the use of a peremptory challenge on the last African-American juror established a prima facie case of discrimination. Consequently, the prosecutor was asked by the trial court to give a race-neutral reason for exercising the peremptory challenge. The prosecutor explained to the trial court that the primary reason that a peremptory challenge was used was due to the juror's stated beliefs on the death penalty and the possibility that she knew members of Defendant's family. (Trial Tr., p. 1576.)

**{¶ 40}** The prosecutor's concerns about the prospective juror's views on the death penalty arose because the prospective juror noted on her jury questionnaire that she did not believe in the death penalty. (*Id.*) Further, the juror at issue responded as follows when asked about the potential need to recommend the death penalty:

Q: And you're obviously sitting 10, 15 feet away from the Defendant, so it's gonna be very real. And under those circumstances, do you believe that if the facts justify it and the law justifies it, that you would be able to put your name on a verdict form saying death? And under the assumption that that penalty would actually occur, could you do that? Some people can, some people can't. That's why it's a tough one.

A. Yeah, that is a tough one. Um, wow, mitigating circumstances - - if I was - - if I had had all the facts and everything was determined, then I guess I would have to, even though my beliefs are what they are.

(*Id.* at 818-819.)

**{¶ 41}** The trial court found that the reason given by the State regarding the juror's views on the death penalty was sufficient to establish a race-neutral reason for exercising a peremptory challenge. The Ohio Supreme Court has stated that "[u]ncertainty about how a prospective juror perceives the death penalty is a 'race-neutral reason' for exercising a peremptory challenge against her." *Were*, 2008-Ohio-2762, at ¶ 65.

**{¶ 42}** We acknowledge that the juror did state after further questioning that she believed that she could recommend the death penalty if the evidence warranted such a recommendation, in spite of her beliefs. But that fact alone does not establish that the State's race-neutral reason was a pretext. Rather, "[w]hile a prospective juror's answers may be sufficient to survive a challenge for cause, both prosecutors and defense attorneys must remain free to challenge on a peremptory basis jurors whose answers create overall concerns on the subject at issue." *State v. White*, 85 Ohio St.3d 433, 437, 709 N.E.2d 140 (1997).

**{¶ 43}** On the record before us, we find that the trial court did not err in finding that the State established a race-neutral reason for exercising its peremptory challenge. Further, Defendant failed to meet his burden of proving intentional discrimination on the part of the State when the prosecutor used a peremptory challenge on the last African-American juror. Consequently, Part A of the second assignment of error is overruled.

**{¶ 44}** "B.  THE TRIAL COURT IMPROPERLY REMOVED A JUROR FROM THE JURY AFTER THE TRIAL BEGAN."

**{¶ 45}** Crim.R. 24(G) and R.C. 2945.29 address removal of jurors during criminal trials. Crim.R. 24(G) provides, in part, that alternate jurors "shall replace jurors who, prior to

the time the jury retires to consider its verdict, become or are found to be unable or disqualified to perform their duties." R.C. 2945.29 provides that a juror may be discharged by the court if the "juror becomes sick, or for other reason is unable to perform his duty * * * ."

{¶ 46} A trial judge is empowered to exercise "'sound discretion to remove a juror and replace him with an alternate juror whenever facts are presented which convince the trial judge that the juror's ability to perform his duty is impaired.'" *State v. Lake*, 5th Dist. Richland No. 2009-CA-0011, 2010-Ohio-1113, ¶ 74 (Citations omitted.)

{¶ 47} In *AAAA Enterprises, Inc v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990), the Supreme Court held:

> "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87, 19 OBR 123, 126, 482 N.E.2d 1248, 1252. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary.
>
> A decision is unreasonable if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue *de novo*, would not have found that reasoning process to be persuasive, perhaps in view of countervailing reasoning processes that would support a contrary result.

{¶ 48} After jury deliberations began, the jury foreperson sent a note to the trial judge

regarding concerns she had about Juror Number 3, who appeared to be struggling with comprehending what was going on during the deliberations. Before proceeding on the matter, the trial judge held a conference in chambers with counsel for Defendant and the State. The trial judge explained that the foreperson's note expressed concerns about Juror Number 3's comprehension of what the jurors were doing in deliberations and that some of the jurors were spending most of their time working with Juror Number 3 to explain what it is they are doing and explaining some of the testimony that he was not able to comprehend. (Trial Tr., p. 3388.) Counsel for Defendant objected twice to the trial judge interviewing Juror Number 3. (*Id.* at 3388-3390.)

{¶ 49} The trial judge questioned the foreperson about her concerns about Juror Number 3. According to the foreperson, Juror Number 3 was having difficulty comprehending the testimony. (*Id.* at 3391-3392.) The trial judge then questioned the court reporter. She explained that Juror Number 3 did not appear to recognize her when they went to look at different parts of the crime scene despite the fact that Juror Number 3 was seated less than 20 feet away from the court reporter during the trial. (*Id.* at 3393-3394.) Two deputies also testified about confusion they noticed on the part of Juror Number 3 when they were transporting him to the hotel in which the jury was sequestered. (*Id.* at 3396-3400, 3408-3411.) Further, a deputy and the court's bailiff stated that Juror Number 3 did not appear to understand the trial court's instructions regarding being sequestered and the fact that no phone calls would be permitted during the time the jury was sequestered. (*Id.* at 3401-3405.) Finally, the trial judge put his own observations of Juror Number 3 on the record. He stated that he observed a few instances during voir dire when Juror Number 3

received explanations from other jurors around him before Juror Number 3 responded to questions from the trial judge. (*Id.* at 3406-3407.)

**{¶ 50}** The trial court determined that Juror Number 3 should be removed from jury deliberations and replaced by an alternate juror. The trial court explained:

Based upon the information that's been given to the Court and the Court's own observations that have been placed on the record regarding this juror, I do not - - I find there cannot be a fair and impartial trial with [Juror Number 3] to continue to be on the jury.

I do believe that he has some cognitive problems in comprehending what's going on in this trial.

The questions that he had regarding sequestration and what hotel, all occurred after they had been given detailed instructions as to the fact that they were going to be sequestered and why; and they were all given a memo from the Court explaining the process of what they would be allowed to do and not be allowed to do.

And, in fact, that the rooms would be inspected and that none of the normal items you would expect to be in a motel such as a clock radio, a radio, television, telephones, will all be disconnected, if not removed, and not be working.

All of that had been explained to the jurors by the Court in the courtroom on the record and was also given written instructions. The fact that he was still not able to comprehend what was happening is indicative of this

Court that he should not be sitting on this jury.

(*Id.* at 3414-3415).

**{¶ 51}** We also note that when the trial court notified Juror Number 3 that he was being released from juror duty, the juror validated some of the Court's concern in the following colloquy:

> THE COURT: [Juror Number 3], there's been a concern raised to the Court that at this point in time perhaps in the trial you have had difficulty either hearing what the Court has said or what the evidence was or understanding what I have instructed.

> [THE JUROR]: You're right. Occasionally I have.

(*Id.* at 3415.)

**{¶ 52}** Defendant argues on appeal that "[w]ithout affording [Juror Number 3] the opportunity to respond, the Court could not rule out that he was simply an obstinate juror who may not be agreeing with other jurors. Because of this, the trial court abused its discretion in dismissing [Juror Number 3] and seating an alternate juror." (Brief, p. 28-29.)

**{¶ 53}** Based on our review of the record before us, we cannot find that the trial court abused its discretion in removing the juror at issue as being unfit to continue his function as a juror. All of the evidence before the court put Juror Number 3's ability to comprehend testimony and directions into doubt. Although an interview of Juror Number 3 may have weighed against those concerns, Defendant twice objected to any interview of Juror Number 3. Any error the trial court made in failing to interview Juror Number 3 was error invited by Defendant and cannot form the basis for reversal. *Royse v. Dayton*, 2d Dist. Montgomery

No. 24172, 2011-Ohio-3509, ¶ 11, citing *State v. Woodruff*, 10 Ohio App.3d 326, 462 N.E.2d 457 (2d Dist.1983).

{¶ 54} The second assignment of error is overruled.

{¶ 55} Third Assignment of Error:

{¶ 56} "THE REPETITIVE USE OF RECOVERED VOICE MAILS AND THE 911 TAPE VIOLATED CUNNINGHAM'S RIGHT TO A FAIR TRIAL."

{¶ 57} "A.   THE OCTOBER 1 MESSAGE WAS IMPROPERLY ADMITTED AS IT WAS A PRIOR BAD ACT AND NOT RELEVANT TO THE CHARGES BEFORE THE COURT."

{¶ 58} "[T]he admission of evidence lies within the broad discretion of the trial court and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that has created material prejudice."   *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 62, citing *State v. Issa*, 93 Ohio St.3d 49, 64, 752 N.E.2d 904 (2001).

{¶ 59} At trial, the State introduced into evidence a number of voicemails that Defendant had left for Serna.   In this portion of his third assignment of error, Defendant argues that the trial court abused its discretion in admitting into evidence and playing for the jury the October 1, 2008 voicemail that Cunningham left for Serna.

{¶ 60} Following Serna's death, the State was able to access Serna's voicemail through one of Serna's friends, Tiffany Ridder.   At trial, the State called Ridder as a witness to identify the voicemails she accessed.   The following excerpt from the transcript of the trial includes the October 1, 2008 voicemail that was played for the jury:

Q: Miss Ridder, again, please just listen to this; and I will ask you some questions afterwards.

SPEAKER ONE: First saved message. Received October 1st at 4:05 p.m.

SPEAKER TWO: Yeah. So how was your lunch today? I wasn't trying to piss you off. I wasn't trying to say too much at length. You know, I said that little shit; but that's how I felt. You know what I mean? Like, fuck it. I feel like ending it sometimes 'cause - - you know what I'm saying? I already know - - I'm already frustrated by other little things. You know what I'm saying? Things that ain't working out the way I want 'em to work out anyway. And things ain't working out the other way I want to work out between us either. You know what I'm saying?

You talking about it was my fault, this, this, and that. You know what I'm saying? That's why (Inaudible) you know what I mean? So why should I try to hurt somebody else, do something to somebody. I go ahead and just hurt myself. You know?

Sometimes I feel like, you know what I mean, me and you, I know we both meant to be together, this, this, and that. <u>And other times, you know what I'm saying, I wish I could just choke you and just make you just listen to me and pay attention</u> and, you know, listen to me what I'm trying to understand what I'm trying to say to you how I really feel. But it's like it's going in one ear and out the other. But, you know, something I just gonna have to deal

with; but I wasn't trying to be funny about that little shit or anything. I was just being for real, man. I was just feeling like fuck it, tell my kids I try sometimes, you know? I do try. I been trying hard to get us together and have us stay together or whatever. But anyway, I know you don't want to hear that.

But I was calling to see how dinner was though, our little lunch thing. Was it okay? (Inaudible) I wasn't trying to argue or nothing. I wasn't trying to piss you off or anything what I said, trying to kill myself. I was for real. (Inaudible) like that. But I don't know, (Inaudible) like that or whatever. You know.

(Trial Tr., p. 2353-2354) (Emphasis added.)

**{¶ 61}** Defendant argues that the October 1, 2008 voicemail was evidence of his character inadmissible pursuant to Evid.R. 404(A)(1), and not otherwise admissible pursuant to Evid.R. 404(B), which provides:

Other crimes, wrongs or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

**{¶ 62}** Further, R.C. 2945.59 provides:

In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or

system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

**{¶ 63}** Defendant argues that "the October 1, voice mail was too remote in time, and not closely enough related in nature, time and place to the offense charged to be admitted for motive purposes. It referenced choking, not shooting, and was clearly a statement made to express frustration, not an intention to harm Serna." (Brief, p. 31.)

**{¶ 64}** The fact that the violent behavior toward Serna that Defendant threatened was choking her and not shooting her is immaterial with respect to its admissibility under Evid.R. 404(B). Evidence of a criminal defendant's other crimes, wrongs, or acts is admissible as circumstantial evidence of the actor's guilt so long as (1) the particular matter which the evidence is offered to show is probative of the defendant's guilt, and not merely proof of conforming conduct, and (2) the evidence offered is relevant to prove the particular matter concerned.

**{¶ 65}** At the conclusion of his opening statement to the jury (Trial Tr., p. 1646), Defendant's counsel told the jurors:

Now, much has been made about this 9-1-1 tape. It is compelling. It is upsetting. There's no way to describe it other than that. You do hear gunshots, and you do hear final words of the individuals. The problem with the tape is it doesn't say who's shooting that

gun.

At the end of this case, we will be submitting to you that Kenneth Robinson did this, not Charles Cunningham. We're going to be asking you to find that there's reasonable doubt that Charles Cunningham did these acts that are alleged against him. All the various types of accounts of murder, the tampering with evidence, and the weapons under disability.

Thank you.

{¶ 66} Kenneth Robinson was Defendant Cunningham's companion and on the scene when Serna and Shook were shot. Defendant's accusation of Robinson made relevant to the State's case-in-chief any evidence that Defendant had a motive to kill Serna, and then Shook. Statements Defendant made within days before the killings that demonstrate the intensity of his anger and hostility toward Serna were admissible to prove a motive that caused him to commit those violent crimes. *State v. Kinley*, 72 Ohio St.3d 491, 497, 651 N.E.2d 419 (1995). The recorded statement to which Defendant objected was therefore admissible pursuant to Evid.R. 404(B).

{¶ 67} "B. THE CUMULATIVE USE OF THE VOICE MAILS AND 911 TAPE WAS ERROREOUS [SIC]"

{¶ 68} Defendant argues that "[t]he fact that the voicemails and 911 were replayed again, in contravention of the Court's directive, at the end of the testimony of the State's last witness, resulted in an unfair trial to [Defendant]." (Brief, p. 32.) Defendant refers to the following colloquy between the trial judge and counsel for Defendant and the State:

MR. SCHUMAKER: At this time, Your Honor, the State would request leave to play those excerpts of State's Exhibit 53 to Miss Morris that were

previously played to Miss Ridder.

THE COURT: Approach the bench, please.

* * *

THE COURT: You want to replay what they just heard?

MR. SCHUMAKER: Yes, sir. This is another witness that can verify and recognize the Defendant on those tapes and the State has the burden of proof to prove that.

THE COURT: How many witnesses do you plan on doing this with?

MR. SCHUMAKER: I think that's all of them. There may be Keisha Serna at the end of the case, but this will be - - this is the last one I think that's testifying, so this would be the last one, except possibly Keisha Serna.

THE COURT: No, this will be the last time that they're played to the jury. If they want to listen to them. They're not gonna play it.

MR. SCHUMAKER: Well, is the Defendant going to stipulate that that's his voice and he made those calls?

THE COURT: Don't know that he has.

MR. MERRELL: We are repeating evidence.

MR. SCHUMAKER: It's not repeating evidence. It's brand new testimony as far as the voice recognition.

THE COURT: She's heard the disc already? Can she identify the disc?

MR. SCHUMAKER: I don't know about in the form that it's in. She's heard voice mail before.

MR. MERRELL: I think I was going to object to it being somewhat repetitive, but I guess I would prefer it if she just asked whether she's heard it and whether she can identify the voice rather than repeating it.

MR. SCHUMAKER: There's a number of voice mails on this. The only way she can say specifically which once [sic] is to hear and tell the jurors that yeah, that's the Defendant's voice.

COURT: Okay. For this witness, you can replay it but I'm not gonna have it replayed again. If you want the witness to identify the disc and message on these particular lines or between these particular times and that's his voice, that's fine; but weren't not gonna keep replaying it for the jury.

(Trial Tr., p. 2362-2365.)

{¶ 69} After this colloquy, the State played the voicemails at issue for Miss Morris. Later, the State called Keisha Serna, Jessica Serna's sister, as a witness and played the 911 tape so that Keisha could identify the voices in the 911 call. Defendant argues that the trial court erred to his prejudice by allowing the 911 tape to be played again after the trial court, in the colloquy quoted above, decided to limit the State's ability to play the 911 tape again. Defendant concedes, however, that his trial counsel failed to object to the replaying of the voicemails and the 911 tape. (Brief, p. 33.) Consequently, Defendant waived any error because he failed to object to the testimony at trial. *State v. Burgess*, 2d Dist. Montgomery No. 20870, 2006-Ohio-772, ¶ 12 (Citations omitted.) Plain error is not demonstrated.

{¶ 70} The third assignment of error is overruled.

{¶ 71} Fourth Assignment of Error:

{¶ 72} CUNNINGHAM RECEIVED INEFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 73} Defendant argues on appeal that he received ineffective assistance of counsel during his trial because his counsel "did not object to the replaying of the voicemails and 911 tape as part of Keisha Serna's testimony, even after the Court indicated that the last time the voicemails were to be played was through Morris testimony."   (Brief, p. 33.)

{¶ 74} Counsel's  performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation and, in addition, prejudice arises from counsel's performance. *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.   To show that a defendant has been prejudiced by counsel's deficient performance, the defendant must affirmatively demonstrate to a reasonable probability that were it not for counsel's errors, the result of the trial would have been different. *Id.*; *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989).   "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.   Further, the threshold inquiry should be whether a defendant was prejudiced, not whether counsel's performance was deficient.   *Strickland*.

{¶ 75} Evid.R. 403(B) authorizes the court, in its discretion, to exclude relevant evidence "if its probative value is substantially outweighed by considerations of undue delay, or needless presentation of cumulative evidence."   The record supports a finding that the court's ruling excluding a second, additional playing of the recorded conversation after it had been played for the witness Morris was made pursuant to Evid.R. 403(B).   That ruling

provided counsel for Defendant grounds to object when the recording was again played for Keisha Serna. However, per *Strickland*, the threshold issue is whether Defendant was prejudiced, that is, whether had an objection been made and sustained by the court, there is a reasonable probability that the result of the proceeding would have been different. 466 U.S. at 694. That reasonable probability is not shown on the record before us.

**{¶ 76}** The fourth assignment of error is overruled.

**{¶ 77}** Fifth Assignment of Error:

**{¶ 78}** "CUNNINGHAM'S CONVICTIONS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE AND THE MANIFEST WEIGHT OF THE EVIDENCE DOES NOT SUPPORT CUNNINGHAM'S CONVICTIONS."

**{¶ 79}** A sufficiency of the evidence argument challenges whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). The proper test to apply to such an inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks,* 61 Ohio St.3d 259, 574 N.E.2d 492 (1991):

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

{¶ 80} When reviewing a judgment under a manifest weight standard of review:

[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [factfinder] clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which evidence weighs heavily against the conviction.

*Thompkins,* at 387, quoting *State v. Martin,* 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 81} Defendant was convicted of **one count of aggravated murder in violation of R.C. 2903.01(A), two counts of felonious assault in violation of R.C. 2903.11(A)(2), two counts of murder in violation of R.C. 2903.02(A), two counts of felony murder in violation of R.C. 2903.02(B) and 2903.11(A)(2), two counts of having weapons while under disability in violation of R.C. 2923.13(A)(3), and one count of tampering with evidence in violation of R.C. 2921.12(A)(1). We will briefly summarize the elements the State needed to prove beyond a reasonable doubt in order to secure convictions on the counts set forth in the indictment.**

{¶ 82} R.C. 2903.01(A) provides: "No person shall purposely, and with prior calculation and design, cause the death of another or the unlawful termination of another's pregnancy."

{¶ 83} R.C. 2903.02(A) provides: "No person shall purposely cause the death of

another or the unlawful termination of another's pregnancy."

{¶ 84} R.C. 2903.11(A)(2) provides: "No person shall knowingly do either of the following:  (2) Cause or attempt to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordnance."

{¶ 85} R.C. 2903.02(B) provides: "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree and that is not a violation of section 2903.03 or 2903.04 of the Revised Code."

{¶ 86} R.C. 2923.13 provides, in part:

(A) Unless relieved from disability as provided in section 2923.14 of the Revised Code, no person shall knowingly acquire, have, carry, or use any firearm or dangerous ordnance, if any of the following apply:

* * *

(3) The person is under indictment for or has been convicted of any felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse or has been adjudicated a delinquent child for the commission of an offense that, if committed by an adult, would have been a felony offense involving the illegal possession, use, sale, administration, distribution, or trafficking in any drug of abuse.

{¶ 87} R.C. 2921.12(A)(1) provides:

(A) No person, knowing that an official proceeding or investigation is in progress, or is about to be or likely to be instituted, shall do any of the

following:

> (1) Alter, destroy, conceal, or remove any record, document, or thing, with purpose to impair its value or availability as evidence in such proceeding or investigation * * *.

{¶ 88} A review of the evidence at trial establishes that the State presented evidence adequate to permit any rational trier of fact to find that the essential elements of the crimes proven beyond a reasonable doubt. Robinson was in the car with Defendant on the night of the murders. (*Id.* at 2572-2573.) Robinson testified that Defendant followed Serna and Shook and then blocked Shook's vehicle with Defendant's SUV. (*Id.* at 2570, 2669.) After Defendant cut them off with his SUV, Defendant got out of his vehicle in a rage. (*Id.* at 2571.) Robinson witnessed Defendant punch Serna in the stomach and then shoot Serna and Shook. (*Id.* at 2572-73.) Defendant then pointed the gun at Robinson and told him to "get the hell out of here." (*Id.* at 2572-73.) As Robinson drove away in Defendant's SUV, he noticed Defendant approach Carson on the sidewalk and walk off with him. (*Id.* at 2573-2574.)

{¶ 89} Carson corroborated Robinson's testimony by testifying that he got out of Shook's vehicle and started walking when he heard gunshots and a scream. (*Id.* at 2674.) He turned around and saw Shook coming through the two trucks towards her driver's side seat. Then he heard more gunshots and saw Shook fall face first on the pavement. (*Id.* at 2674-76.) Carson then saw Defendant coming through the trucks and it looked like Defendant was stuffing something in the back of his pants. (*Id.* at 2676-2678.) At that point, Defendant then told Carson to walk with him and they proceeded to walk towards the

south end of Springfield. (*Id.* at 2678.) While they were walking, Defendant told Carson, "You didn't see anything. Don't say anything." (*Id.* at 2679.)

{¶ 90} The surveillance video from near the scene of the crimes was played for Carson while he was on the witness stand at trial. He identified himself and Defendant on the video walking. (*Id.* at 2681-82.) Carson testified that they were walking side by side because he was not sure if Defendant would shoot again. (*Id.* at 2683-84.)

{¶ 91} Further, the jurors heard the 911 call that Shook placed around the time of the murders. On the 911 tape, the jury could hear a woman screaming for help and saying, "Get off of her." (*Id.* at 1652.) Amy Morris and Keisha Serna were able to identify the voices on the 911 call. (*Id.* at 2372-75; 2968-2972.) They stated that Shook was the one calling 911 dispatchers, and they both identified Serna in the background screaming repeatedly for Defendant to stop. (*Id.* at 2372-2375, 2972.) They also identified Defendant as the person on the 911 call who said, "I'm not playing man." (*Id.* at 2373, 2375, 2972.) The gunshots themselves can be heard on the 911 tape. No one at trial identified Robinson's voice on the 911 call.

{¶ 92} Donna Rose, a forensic scientist in the Trace Unit at the Bureau of Criminal Identification and Investigation, stated that she examined two samples from Defendant and was able to detect a particle that was highly indicative of gunshot residue on one of Defendant's samples. (*Id.* at 2739-2745.) These samples were from Defendant's right and left hands. (*Id.*) The samples were collected by Detective Hicks on October 4, 2008 around 7:00 or 8:00 a.m. while Cunningham was at Miami Valley Hospital with Serna's family. (*Id.* at 2764-2765.)

{¶ 93} Further, several witnesses testified to threats that Defendant made to Serna throughout the evening and early morning of October 3rd and 4th, 2008. Caitlin Smith saw an altercation between Defendant and Serna while she was standing outside of G.Z. Petes. During the altercation, she heard Defendant threaten Serna by saying, "Bitch, if I can't have my family, you can't have anything." (Tr. 1725-1726.) At Burger King, Defendant argued with Serna and Shook and hit Shook's vehicle. (*Id.* at 2568, 2665.) The manager heard Defendant say he was going to "hurt 'em." (*Id.* at 2482-2484.) Another Burger King employee, Robert Farmer, heard Defendant say, "I'll kill everybody in the truck." (*Id.* at 2502.)

{¶ 94} Serna also made statements to Marcus Douthy the night of the murders about Defendant, and she sounded panicked. She was yelling and almost crying when she stated, "[Defendant's] following me baby. he's following me, he's crazy, he's crazy * * * ." (*Id.* at 2440.) During this conversation, Douthy heard Shook in the background saying, "What's he doing?", and then the phone went dead. (*Id.* at 2443-2444.)

{¶ 95} Damon Burks, who resided with Defendant for a short period of time around the time of the murders, testified that on the morning of the shootings Defendant spoke with him on the telephone. Defendant said, "I messed up, I messed up." (*Id.* at 2758.)

{¶ 96} Moreover, just two and one-half days before the murders, Defendant left Serna a voicemail in which he said he wished he could choke her and make her listen and pay attention to him. (*Id.* at 2349-2355; 2369-2371.) Shortly before Serna and Shook were killed, Defendant left Serna two voicemails in which he stated his frustration that Serna would not answer his calls to her. (*Id.* at 2349-55; 2365-68.) Defendant called Serna's phone

eleven times between 2:17 a.m. and 2:46 a.m. the morning of the murders. (*Id.* at 2895-2900.)

{¶ 97} Finally, a deputy clerk with the Clark County Common Pleas Clerk of Courts stated that Defendant had two prior convictions. (*Id.* at 2393-2395.) These convictions were for aggravated assault and possession of crack. (*Id.* at 2394-2395.) Officer Douglas Hobbs confirmed that the person he arrested for the possession of crack charge was in fact Defendant. (*Id.* at 2401-2403.) The deputy clerk further testified that neither of the files pertaining to the two convictions contained a court order relieving Defendant from his disability to carry firearms. (*Id.* at 2397.)

{¶ 98} Based on a review of the testimony and evidence presented at trial, and viewing the evidence in a light most favorable to the prosecution, we conclude that any rational trier of fact could have found the essential elements of the crimes  proven beyond a reasonable doubt.

{¶ 99} Further, the evidence summarized above is competent, credible evidence of Defendant's guilt. Based on this record, we cannot find that Defendant's convictions are against the manifest weight of the evidence.

{¶ 100}       Despite the overwhelming evidence of his guilt presented at trial, Defendant argues that he should not have been convicted of any of the offenses set forth in the indictment because the State failed to prove, beyond a reasonable doubt, that Defendant shot Serna and Shook and that he had possession of a gun to do so. Defendant bases his argument on his own testimony that Robinson committed the murders and that Robinson lacked credibility. The credibility of the witnesses and the weight to be given to their testimony are

matters for the trier of facts to resolve. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967).

{¶ 101}    In *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684, *4 (Aug. 22, 1997), we observed:

> Because the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

{¶ 102}    This court will not substitute its judgment for that of the trier of facts on the issue of witness credibility unless it is patently apparent that the trier of facts lost its way in arriving at its verdict. *State v. Bradley*, 2d Dist. Champaign No. 97-CA-03, 1997 WL 691510 (Oct. 24, 1997). Based on our review of the record before us, we cannot find that the jury lost its way in arriving at its verdict.

{¶ 103}    Defendant also argues that even if he committed the murders of Shook and Serna, "the State did not prove beyond a reasonable doubt that those murders were conducted with prior calculation and design. The jury acquitted Cunningham of the aggravated murder of Shook – meaning they did not find that her death was the result of prior calculation and design." In short, Defendant appears to argue that the jury's not guilty verdict on the count charging Defendant with aggravated murder of Shook is inconsistent with the

guilty verdict on the count charging Defendant with aggravated murder of Serna. We do not agree.

{¶ 104} In *State v. Hawkins*, 2d Dist. Montgomery No. 21691, 2007-Ohio-2979, at ¶ 23-24, we wrote:

Courts in Ohio have held on numerous occasions that an inconsistency in a verdict cannot arise from inconsistent responses to different counts. *State v. Brown* (1984), 12 Ohio St.3d 147, 12 OBR 186, 465 N.E.2d 889, syllabus; *State v. Hayes*, 166 Ohio App.3d 791, 2006-Ohio-2359, 853 N.E.2d 368, at ¶35. Instead, an inconsistency only arises when a jury gives inconsistent responses to the same count. *State v. Washington* (1998), 126 Ohio App.3d 264, 276, 710 N.E.2d 307. The Ohio Supreme Court has explained that "each count in an indictment charges a distinct offense and is independent of all other counts. Following that reasoning, the court found that a jury's decision as to one count is independent of and unaffected by the jury's finding on another count." *Id.* See, also, *Browning v. State* (1929), 120 Ohio St. 62, 165 N.E.2d 566, paragraph three of the syllabus.

Moreover, in the context of inconsistent verdicts of conviction and acquittal, the United States Supreme Court has provided, "'The most that can be said in such cases is that the verdict shows that either in the acquittal or the conviction the jury did not speak their real conclusions, but that does not show that they were not convinced of the defendant's guilt. We interpret the acquittal as no more than their assumption of a power which they had no right to

exercise, but to which they were disposed through lenity.'" *Dunn v. United States* (1932), 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356, quoting *Steckler v. United States* (C.A.2, 1925), 7 F.2d 59, 60. In *United States v. Powell* (1984), 469 U.S. 57, 105 S.Ct. 471, 83 L.Ed.2d 461, the Court reiterated its holding in *Dunn*, explaining that inconsistencies between verdicts on separate counts do not necessarily mean that a jury made a mistake. Even if an inconsistency was found to be an error working against a defendant, the Court stated that review is unwarranted, for "an individualized assessment of the reason for the inconsistency would be based either on pure speculation, or would require inquiries into the jury's deliberations that courts generally will not undertake." *Id.* at 66.

{¶ 105} The aggravated murders of Serna and Shook were set forth in separate counts of the indictment. Further, it is not necessarily inconsistent for a jury to find that Defendant had the requisite, prior calculation and design in murdering Serna, who he had threatened a number of times leading up to the morning of the murder, while he did not have the prior calculation and design to murder Shook. Therefore, we decline to find that a not guilty finding on Count 5 of the indictment is inconsistent with or precludes a finding of guilty on Count 1 of the indictment.

{¶ 106} The fifth assignment of error is overruled.

{¶ 107} Sixth Assignment of Error:

{¶ 108} "THE CUMULATIVE EFFECT OF ERRORS COMMITTED DURING CUNNINGHAM'S TRIAL DEPRIVED HIM OF A FAIR TRIAL."

{¶ 109}     Separately harmless errors may violate a defendant's right to a fair trial when the errors are considered together. *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000).   To find cumulative error present, we first must find multiple errors committed at trial.   *Id.* at 398.   We then must find a reasonable probability that the outcome below would have been different but for the combination of separately harmless errors. *State v. Thomas*, 2d Dist. Clark No. 2000-CA-43, 2001 WL 1103328, * 9 (Sept. 21, 2001) (Citations omitted.)

{¶ 110}     In order to have cumulative error, multiple errors must be present. Because we have not found multiple, prejudicial errors, there is no cumulative error. *Madrigal*; *State v. Ruby*, 149 Ohio App.3d 541, 2002-Ohio-5381, 778 N.E.2d 101, ¶ 78 (2d Dist.).   The sixth assignment of error is overruled.

### III. Conclusion

{¶ 111}     Having overruled all of the assignments of error, we will affirm the judgment of the trial court.

DONOVAN, J., And HALL, J., concur.

Copies mailed to:

Lisa M. Fannin, Esq.
Brandin D. Marlow, Esq.
Hon. Richard J. O'Neill